The second case on the call is 2-3-1078, Richard Langston v. Irwin, Florida. Arguing on behalf of the appellants is Sheldon Stark v. James Ford, and arguing on behalf of the attorneys is Jonathan. Thank you. Since there are two names, are you going to split up your time at all? Yes, Your Honor. I will be addressing the Ecclesiastical Extension Act under the law of the case, and the constitutional affirmative defense of Mr. Ford will address all of their issues. I'll take about eight minutes, and Mr. Ford will take seven. Okay. Who's going to go first? I will, Your Honor. Very well. Your Honor, in the instructions that came from the clerk's office, it said that if during the oral argument you will be referring to non-Illinois cases, that I was to prepare four copies of those opinions. I have prepared those. The first two opinions are opinions, one out of Arizona and one from Washington, that cite the Bruss case that this Court handed down in September of 2008 extensively. And the remaining three or four cases deal with ordination and ecclesiastical government. I would like to give those to the deputy.  Thank you very much, Your Honor. Mr. Ford. May it please the Court, this is a false light invasion of privacy case based on the publication of a letter revoking a ministerial ordination, which is an act of church governance. The paradigm issue before you is, does any civil court have jurisdiction concerning the publication of a purely ecclesiastical opinion, which is what ordination is? This case, as you know, is on its second time up. Two of you were on the panel who wrote the remand opinion. Since the remand opinion, you have come down with Bruss in September of 2008. As I read and understand Bruss, I think there is a conflict between the two opinions that this Court should address. The interesting thing is the opinion out of Arizona and the one out of Washington cite Bruss. In fact, the one out of Washington cites Bruss more than any other opinion, follows your reasoning. So Bruss is being well received in other states. In fact, I suspect it's probably going to be one of the most often cited cases on the church governance issue. Now, I think I must address the law of the case first. Let me ask a question or two about Bruss. Do you think that Bruss is factually similar? Is there anything that distinguishes the two? In other words, precedent is a holding that we are required to follow based upon the same or substantially the same set of facts. So it's your position that Bruss has the same or substantially the same set of facts as in this case? It does not. It is dealing with the church governance issue, though, is where you have in Bruss you're dealing with the qualifications of a minister. In the remand, in the Duncan case, you're dealing with the revocation of an ordination, which is the qualifications of a minister. So in that sense, yes, they are identical because it goes to qualifications of a minister. And so to that extent, you've got some language in the remand opinion that the Bruss opinion is reasoning to the contrary. And I think the problem comes up in understanding what is ordination and how does it fit into church governance. Ordination usually takes place in a public ceremony called an ordination ceremony. But it is the publication in that ceremony that this individual has met the theological qualifications of the ordaining body to become a minister. Well, let me give you an analogy, and that is that lawyers can be suspended, censured, disbarred, or they can voluntarily request that their name be removed from the active roles. And if their name is removed from their active roles on their own volition without any charges pending against them, and someone went around saying that they're no longer a lawyer because they were found with embezzled client funds, it's true that they're no longer a lawyer, and it's true that there is a statutory structure, just as there's apparently a structure that the church has to determine whether or not someone is qualified to be a priest, pastor, parson, or whatever. But if someone goes around saying things that aren't true as to the basis for the decertification, that seems to me to be something other than something that is covered by privilege, ecclesiastical privilege, or any other privilege. In other words, you can't go around making falsehoods about why something is taking place. And I don't know that Brost – does Brost address falsehoods? It does not. Okay. It does not. But I am glad that you used the analogy that you did because what you have done is brought up the Ogle case out of the Sixth Circuit, in which an ordination is likened to the licensing of an attorney to practice law. And it holds that as long as you hold the license – and Duncan held the ordination until it was revoked. The fact that he had no longer been on staff at Moody and had become the pastor elsewhere is likened to me coming from Texas, where I'm licensed, to practicing law in Illinois. And as long as I have my license from Texas, if I engage in conduct here, I guarantee you I may not be living in Texas, but the Supreme Court can revoke that license. So he still held the ordination. Had he – when he left Moody, if he had sent his ordination back, we're not here. The only reason that the proceedings were begun at Moody were because of complaints filed by leadership, former leadership of his church, back on the ordination he still held. You're correct, Your Honor. If I send my license back to Texas, Texas is through with me. No question about it. But that's not Duncan's situation. Until it was revoked, he still held that ordination. And that's all Moody knew, was he held our ordination. So Oval is correct in saying that there is still control over that ordination. In fact, you have two cases that I've given you here. The Alford case that says no state has subject matter jurisdiction over an ordination. And the Supreme Court of Arkansas in the Kinder case has held the same thing. I'm not sure that this case is anything about whether or not this man has the right to baptize or preach in front of anybody. I got the impression this was based upon financial damages brought on by statements that were not true. And so the concept of revocation of an ordination seems to me to be somewhat of a side issue. In other words, whether I am or am not a lawyer doesn't relate to whether or not the State Bar or the Supreme Court did or did not remove my name from the rolls, but how it happened. And I don't know that members of a church have immunity from libel or slander. And that's my problem with your argument that ecclesiastical privilege exists here. Let me try to help you with the trouble that you're experiencing, and I thank you for your candor in expressing it. First of all, we're talking about the publication of a letter signed by Dr. Lutzer and signed by the Chairman of the Elder Board. The publication of a letter that was informing Duncan of the revocation. That's what we're talking about. Like the publication coming from the State Bar to the attorney that you're no longer licensed, and it sets out the basis that you're no longer licensed. Now, that's the only publication we're talking about. If the basis is false, the conclusion is you're suspended. Here's the five reasons why, and those are false statements. And the question is, does a civil court have the subject matter jurisdiction to evaluate the basis of the revocation of the ordination? That's the question you're really raising. That is the question. That is the question. And you have the Higgins v. Moore case, which is the fifth case that I have given you, which says you can libel, you can defame, and there is no subject matter jurisdiction, so long as it is within the communication that is going to people within the sphere of who have a right to know. That's exactly what Higgins v. Moore says. But now, let me also address this, and I think this is extremely important. You're setting a judgment on the publication of the ordination letter that revoked it. That's what you're setting a judgment on, because we're only talking about one letter, because the only thing that Dr. Lutzer and the chairman of the Oval Board signed was this one letter who went to the three people who made the complaints and to Duncan. That's all they published it to. And so what you're trying to say is if that letter has libel or would fall into the category of false plight, invasion of privacy, you're trying to say that's actionable. Now, let me show you how. I think what I'm trying to say is that this Court is not going to ordain anybody, nor are we going to order your client or Moody Church to reordain or recertify him as an ordained minister. That is not what we are here for, and that's where I think the ecclesiastical privilege comes in, which is you have the right to excommunicate or not to excommunicate, but you don't have the right to libel or slander. And so he's not asking, to my knowledge, that he be reinstated in your church. If he were, the case would be gone, I believe, because I don't think anybody has said that we're going to tell you whether or not you have to accept him, whether you had to accept him originally or whether you have to accept him now after there's been a jury finding that what was said was false. That isn't what we're here for. And I would agree with that, Your Honor. And maybe I'm not being clear on what my argument is. When this case first came up, this Court clearly found that the ordination decision process fell within the ecclesiastical abstention doctrine. But then you go on to say that the publication of that decision can be governed by neutral principles of law. What I want to point out to you is if you destroy the ability to publish what has been made, you destroy the whole privilege, and that's what the amici have been saying. Isn't there a difference between publishing your conclusion, in other words, your ordination is revoked, end of letter, versus your ordination is revoked for these reasons, 1, 2, 3, 4, and 5, and those reasons are false? And we're not litigating here whether or not your decision to revoke the ordination was right, wrong, or otherwise. Arguably, that is the purview of the Church. But when you tell the world false statements, isn't that simply slander and libel and has really nothing to do with the action of the Church? Accepting what you're saying, which is not our facts here. Higgins v. Morris says the Court still doesn't have subject matter jurisdiction, and that's what the amici briefs say. You still don't have subject matter jurisdiction over the publication of that. Because the religious body has the right to say to the individual who is revoked, here are the reasons why we did it. To the individual who was revoked, no one else. You do have the right to respond to the three people who brought the charges. But does Higgins actually say that to give them the three people who brought the complaint are entitled to know the outcome of the investigation or to know your reasons why? The reasons that were stated in there were what they brought to us. We didn't create the reasons, the three people who brought the charges. That's what was in the letter. They didn't come from us. They came from the three people who brought the charges. So they weren't getting anything that they had not given to the Church. The Church simply said, based on the reasons you gave us, we're revoking it. That, in essence, is the same thing as what you're saying, Judge. Now, let me also hasten to this point here. There is no defamation anywhere in this letter, if this were put into a secular context. And there is no false light invasion of privacy for one simple reason. At the time of publication, there is no knowingly false statement by those who published it. Your opinion points out in the remand that it was learned after the publication that he held a second ordination and that we wouldn't retract once we learned of that. That is a post-publication information. But if you take this, and I've been defending Lowell in defamation cases for 25 years, you take this, put it in a secular context, there's no defamation, there's no invasion of privacy. Because there's no knowingly false statement in here, and that's the definition of malice that applies to false light and to defamation straight across the board. Neutral principles of law cannot come into play when it comes to the publication of an opinion. Let me just give you another example that I think you, as judges, can appreciate. You have absolute privilege in your decisions that you make. Your process that you follow outside of this courtroom, back in chambers, or in your conference room, whether you follow your internal procedures or not, it's absolutely privileged. Now, you publish an opinion. That opinion is just as absolutely privileged as the process you went through to make it. That's what we're talking about here. That's what the amici are talking about here. To give you some idea of the significance of this case, it's rare that amici file at an intermediate appellate court level. These amici that have come in here generally are filing in the Supreme Court of the United States. And very effectively so. Rutherford would have been in here, but they couldn't make the deadline, so you would have ended up with four in here. They see the remand opinion that went back as a tremendous attack on well-settled constitutional law. That's why they came in here. Now, your gross opinion, which is dealing with the same area of church ordination, church governance, that's another term for ecclesiastical abstention. That has got to be constitutionally protected. I agree. If you were to publish a bunch of very, very false statements, publish it to the individuals who had a right to know it, and then somebody down the line is republishing stuff out there that is false, you could sue them, but not in the ordination process. By the way, it's undisputed that Irvin Lutzer, according to the record, only published this to the three individuals who made the charges. And remember, as I said a moment ago, these charges came from those three individuals. The church had no clue where they were coming from. They just simply said, based on these charges, it's revoked. Sir, your time is up. Thank you very much. You're welcome. Does Mr. Ford have any opportunity? Yes, he does. Did you separate their time? I thought you did. Yes. The buzzer was for his time only, not the entire time. I'll try not to repeat anything my co-counsel has referred to. I want to talk primarily about how the evidence before the jury failed to support the evidence for a false light. First of all, and most importantly, there is no false statement in the May 9 letter. The May 9 letter is the revocation letter that is the basis of the plaintiff's claim that the jury was instructed upon. The Kirchner case says that a false statement is a prerequisite to recover. There must be specificity as to what the false statement is. In the Kirchner case, there was an allegation that the newspaper article about Kirchner intimated that he was after money and that that was false. The dismissal of that claim was affirmed. In the Pulis case, another example of what the false statement is, there the defendant said that the plaintiff had sexually abused his foster child and had tested positive for gonorrhea. Those were false statements. Here, there's nothing in the May 9 letter that's a false statement. Duncan never testified in any statement. Well, you're making a slightly different argument. You're saying false statement versus what Mr. Sharp said, which was knowingly false, and there's a difference between the two. That's true, and I'm going to get to the knowingly false. I think you have to start with a false statement and then determine whether it was knowingly false. So I'm saying there's not even a false statement in that May 9 letter. And Duncan never testified there was a false statement in that letter, and no one did. Now, what the plaintiff has argued is that all the letters should be taken together. And at trial, the plaintiff argued that the false statements were actually in the April 23 letter. That's the letter that reiterated the charges that were brought to the Moody Church. And those were reiterations of charges. The Moody Church did not say, we are charging you with doing these things. The Moody Church said, people from your church came and gave us these charges. And the letter, April 23 letter, accurately states, and the testimony of trial said this, accurately states what the charges were that were brought to them. So even if we go beyond the April 23 letter, the plaintiff argues that looking at the April 23 letter, the jury could interpret the April 23 letter as meaning that the Moody Church had determined that Duncan had committed these charges. So they're saying the jury has to interpret that letter. That's the same thing as Kirchner. There's not a false statement. There has to be a false statement first. And then we go on from there. Here, if you look at the April 23 letter, reiterating charges, it says specifically, these are the charges that the men from the Hope Church brought to us concerning you. And the testimony was at trial. Yes, this letter accurately says what the charges are that we brought to the Moody Church. If you look at the Lovegreen case, when the Supreme Court adopted the restatement for the false light tort, it said that the outrageous character of publicity comes in part from the matter being reported was being false, and deliberately so. In other words, knowingly so. But you have to have a false statement first. And then the question is, did you know it was a false statement? Because that's the horrendous part of this tort. You knew it was false, and you said it anyway. And that's what you have to have, the false statement first, and then the knowingly false. And the testimony at trial, looking at the May 9th letter. What steps did Moody and the defendant do to determine whether or not the allegations that were brought to them were false or true or partially true? Well, looking at the requirements for actual malice, it's either knowing that it was false or acting in reckless disregard for whether it was false. So your question really comes to the reckless disregard part. Well, it comes to, if somebody comes to me and makes allegations, and I decide I'm going to judge somebody or something based upon those allegations, I will either assume in order to rightfully conclude, I either have to determine that those facts are uncontroverted, they're a matter of public record, or there should be some sort of hearing or proceeding whereby the metal, M-E-T-T-L-E, of those charges are proven true or false. Now, we can argue about what the burden of proof is, preponderance, clear and convincing, or beyond a reasonable doubt. But the point is, I'm having, and I, the point is, your church can do whatever you want when it comes to granting or denying ordinations. You don't have to have a hearing. You can accept anybody's statement off the street. But when it comes to making judgments about facts that might hold people in a false light, how or what did your clients do to determine whether or not this was either true, false, what steps did they take? Because if they didn't take any steps, wouldn't that allow a jury to determine that this was reckless disregard? No, not necessarily. Okay. Let me address that, please. First of all, what the Moody Church did do is they had these three men come to them and discuss the charges with them. They knew one of the three men, listened to the charges that were given from the two men at a first meeting, called the third man, Puccinelli, third leader, and reviewed the charges with him, and he said, yes, I concur with those charges. So what they did do is listen to the charges and discuss them and write them down. Now, what they did is where reckless disregard comes, if you look at the May 9th letter, because that's the communication that we're talking about, Plano Fuente's expanded to the April 23rd letter, and I'll talk about that, too. But if you look at the May 9th letter, first of all, is there a false statement? You don't even get to investigation, which they brought up, if there's not a false statement. And then you only get to beyond whether or not there was a knowingly false statement. You only get beyond that if there's reckless disregard. And that's where we talk about having serious doubt. Now, the restatement and the cases talk about there has to be, in fact, doubt, evidence of serious doubt as to the truth of the statements, in high degree of awareness that they're probably false. Only then do the cases talk about a possible duty to go out and investigate. And if you look at the citation in the brief on SAC, it explains that. You only get to that if there's evidence of reckless disregard. Here, there's no evidence of a knowingly false statement, and there's no evidence of serious doubt as to the statements that were in the May 9th letter. Plano Fuente expanded to the April 23rd letter, the one with the charges. Look at the wording of the letter. It says, men from your church have come to us, and these are the charges that they have made against you. And it recites the statements. At the time that letter was sent, even the April 23rd letter, there was no knowing falsehood in there, and the defendant was questioned about this. Was there a falsehood in that letter? Was there a falsehood in the May 9th letter? There's no testimony from anybody, any witness, that any of the statements there, as they are made, are false. What they want to go by is the impression, the interpretation, and that's not the tort. The tort is there has to be a statement that's false. And they want to say, well, you can interpret this. And they say, you can interpret it, the argument that was made at trial, you can interpret this April 23rd letter to imply that they can conclude that he's an adulterer, a crook, a philanderer. But that's not the false light that they're claiming in the case. It's that he was not a minister any longer. The communication that the Moody Church made, and here the case is about, the subject matter of this case is the communication of what the Moody Church did. Any questions? Your time is up, sir. Thank you very much. Mr. Quinn? Thank you, Your Honors. May it please the Court. I'd like to begin by addressing a few of the things that were just brought up. First of all, this idea about the May 9th letter. What there was, what the testimony showed at trial, was that there was a cover letter dated May 9th. And along with that May 9th cover letter, there were three enclosures. One of the enclosures was the May 9th letter that Mr. Ford speaks about. The other enclosure was the April 26th letter with all those allegations that just spoke about. And then there was another letter. And so the point being is that he's trying to say that those other letters shouldn't count because they were merely enclosures, they were merely attachments. Well, it's all a single publication. If I had a client come to me and tell me, hey, I'd like to publish some falsehoods about somebody in a letter, is that okay? I would say no. If he said to me, well, what if I put in an attachment to the letter? Is that okay then? I'd say no, it's still not okay because it's all one publication. The semantics about the specific dates are just nominal. Is the other letter that was attached actually dated April 23rd but should have been dated May 5th? Is that the one that says we're having a meeting on May 8th and if you are innocent of even one of these charges, please come forward. That's the third letter. There's one letter that's April 26th and it lists out the part about the philandering and the drunkenness and stuff like that, and that letter was quoted in the- Is that April 23rd? I may be mistaken on the exact date. That specific letter was quoted- It's the two-page letter. Right, in the Duncan v. Peterson opinion. Furthermore, this court has already considered whether or not a jury could conceivably find falsehoods in the letters. They looked at it and in the Duncan v. Peterson opinion, they identified the part about the not losing trust in your wife as an allusion to this infidelities and also the part about the authority. Certainly if you were to present those letters to anyone off the street, they'd come away with the impression that the Moody church has some sort of oversight and hierarchical authority over the whole church, which is not true. And testimony at trial showed that there's not even a claimed relationship between the two churches. What's your take on the Bruss case? My take on the Bruss case is that it's a different set of facts. I especially want to point out that in the Bruss v. Prisvilla case, you have a situation where a pastor was, I don't know, accused of doing some sort of improprieties. And so certain members of the church wanted him removed, and whoever the leadership authority in that church didn't remove him, so they came to court and they asked the court to remove the pastor. Well, that's a completely situation than the present case. We're not asking the court to install Reverend Duncan in a certain position or remove him from a certain position. We're not asking the church to do any type of thing. So I think it's completely different on that grounds. The other thing is that the pastor in that case was a current employee of the church. Duncan separated himself from the church eight years prior to the incident that gave rise to this lawsuit. And one thing I'll point out is that the case Watson v. Jones, which initiated all this ecclesiastical abstention doctrine that set the whole ball rolling on this line of case law, that case spoke very specifically about this concept of implied consent. And basically what they said in Watson v. Jones sort of justified the creation of this ecclesiastical abstention doctrine is that a church government should be allowed to govern its own members because the members are exercising their First Amendment rights to practice religion and they're consenting to this arrangement. They're choosing to join the church. They're choosing to subject themselves to whatever this church government decides. But in this case, we don't have the implied consent. Reverend Duncan left the church eight years before this happened. He didn't have anything to do with it. He wasn't employed by the Moody Church. He wasn't a member of the Moody Church. He had his own church in another area, and he was doing fine on his own. Then when this whole thing broke loose and the letters went out, Reverend Duncan spoke to one of the elders at the Moody Church, and he told them, Why are you raising implied consent? I don't quite understand how it relates to this case if, in fact, he isn't part of it and we're talking not about, as you said, he's not asking to be reinstated. I just bring it up because my point is that the justification for this idea that a church can govern its members is that the members are there voluntarily. My point is that Reverend Duncan is not volunteering to be under this authority. He's not under this authority. So it would be dangerous to allow the ecclesiastical abstention doctrine to allow churches to discipline members. Now, I personally don't believe that the law would allow a church like the Moody Church to print falsehoods about an individual who is a member, a current member, card-carrying member of a church. But even if it were determined that that were allowed, they certainly shouldn't be allowed to spread falsehoods about an individual that chose to withdraw from the church that hasn't been a part of the church for eight years. That's my opinion. Do you agree that we've already determined that the ecclesiastical abstention doctrine does not apply in this case and that would be the law of this case? Yeah, I think all of these issues were resolved in the first case. And, in fact, when we brought the second case, we used that first case opinion as a blueprint to make sure that we didn't cross any lines during the trial. And, very clearly, this isn't a case about the ordination. Now, time and time again they bring up the ordination, but this has nothing to do with the ordination. We don't care about the ordination. The facts of this case are that the falsehoods that they spread led to the destruction of Reverend Duncan's career. And, because of that, he suffered damages, and we proved those damages before a jury. And the jury awarded him damages. That's, as far as I'm concerned, the legal issues were really resolved in the first case. What about whether the statements were false at the time they were made or whether they were not false at the time they were made? Well, that gets back to this knowingly false idea. But it's not just knowingly false. It's knowingly false or a reckless disregard. Now, even if, and I think based on the testimony, that the jury could come away with the belief that Mr. Lutzer thought,  Reverend Lutzer testified at trial that they didn't do anything. They didn't do any kind of review. They didn't do any kind of investigation. He really had no idea whether any of these were true, yet he published the letters. And so that's a reckless disregard. And clearly the jury could have found that there's a reckless disregard of the truth. Well, the one letter does say that because you have not come forward to answer these charges, we make these findings. Does that mean we make the finding that you are no longer to use the holding, to use the term pastor or something of that nature? Does that mean that they did nothing, or does it mean that they considered what they had but they had no more? Well, I think the testimony showed at trial that they basically had no information other than that these three individuals came to them and asked them about this. And I think also the testimony at trial could be interpreted to mean that these three individuals weren't completely sure about these things themselves, and they were asking the Moody Church to investigate. But the Moody Church very clearly did not do any kind of investigation. And the fact that Reverend Duncan declined to show up to defend himself, he's under no obligation to appear before them to defend themselves, and it would be a dangerous precedent to allow someone to make false statements simply because If he were a member of the church, would he have a responsibility to show up? If he were a member of the church, I would still say no. I don't think... What about implied consent? Wouldn't he impliedly consent to submit to them? I don't believe that individuals should ever publish statements that they don't... just offensive statements about an individual unless they know they're true. And I think a case could be made that even if individuals were members of the church... Well, if you're held to fault, doesn't that mean that the complaint is taken as confessed against you? Yes, but I think... But then again, we're applying legal principles to a ecclesiastical construct. Right. These aren't legal proceedings. And somebody who has been served with a complaint has an opportunity to go to an attorney and find out what the implications of not appearing before a court are. These are individuals. They're people in society. And I don't think we should elevate church bodies. And again, no formal moody church tribunal was ever formed in this case. But even if one was, I don't think we should say that an individual has a duty to appear before them. Now, maybe if they're a current member of the church, they should appear. And that's clearly not the case here. If we accept the premise that there was no investigation of these charges... and the jury could then take whatever, that they were intentional or they were knowing or they were reckless... and we say that the jury could do that... are we impliedly then putting a layer on church governments to say, in order to make these charges, you have to do an investigation? I think churches, if they want to remove people, or if they want to punish people, then they can ask, they can say, well, we've decided that you should be punished and we'd like you to come to submit to our authority. And then the person would have the opportunity to decide whether or not they want to continue to be a part of the church. And if they had simply sent a letter that said, well, we've decided we're revoking your ordination, then there would be no problem here. But I don't think churches should be allowed, by virtue of being churches, to write whatever they want and not have any consequences for the damaging effects of false things that they don't know, they don't have knowledge about, are true. And I think that's what the law is. And I think that's why the first Duncan opinion was decided the way it was. And I think that's how it should continue to be. So your bottom line is the church can say, we revoke any and all authority that you have under this church. You can't use this name. You can't use our affiliation. You can't do anything. But when they fail to investigate the reasons and then publish those reasons, that steps over the line. Absolutely. Absolutely. If a burning bush tells a church that somebody committed a crime, then they're entitled to have that belief. But if the church takes it upon themselves to go out and apprehend that person and confine that person, well, that person should be able to recover for the tort of false imprisonment. Being in church should not give blanket immunity to committing tortious acts. That's my position on that. I don't know. It's been so interesting I didn't notice whether the buzzer went off or not. Did it? They're not even here. I don't even see the buzzer. I think your time is up, Boyd. We've given you more than you're allowed to say. Thank you, Your Honor. You're welcome. Mr. Sharp. Your Honor, I want to address first about the ecclesiastical due process question that you began with opposing counsel. The courts have unanimously held there is no such thing as ecclesiastical due process, and they cannot cite one opinion that says there is because they all say the contrary. Now, the other thing is this. Duncan was invited to come to the church and respond to the charges made against him. He was requested on more than one occasion to please respond to those. Whether he did or how they handled it, the Ogle case says that is still outside the subject matter jurisdiction. Justice Hutchinson, you've raised a very good question about, well, didn't we decide this ecclesiastical extension doctrine in our first opinion? And in your first opinion, it's very clear that it was limited to the making of the decision. In fact, it's precisely that. Now, upon remand, for the first time, I raised it as to the publication, which 10 courts from all other states say the ecclesiastical extension doctrine goes to the publication as well. That's not in your first opinion. Okay, but the publication, as we've talked about, why isn't it just the May 9th letter? The May 9th letter is the whole basis of the lawsuit. But it had attachments. The one that was sent to Duncan, whatever it had, it still went just to Duncan. There can be no cause of action when you send it to the plaintiff. And whatever went back to the three people making the complaints, those things that are in there came from them, so there's nothing new in there. But it's important to note that law of the case applies to what was decided by this court the first time. On remand, it was raised ecclesiastical opinion is protected by the speech and religion clauses. That's not governed by your law of the case, and that's been raised. In ordination, you got undisputed testimony that the publication of an ordination is an ecclesiastical opinion. The Gertz opinion out of U.S. Supreme Court says any opinion is constitutionally protected, even if it's an opinion that you judges are a bunch of folks that are not real good. It's still protected. Now, when it's an ecclesiastical opinion giving ecclesiastical reason, it's also protected. But let me think about this. The jury found the church was not liable on this letter. It found the chairman of the elder board was not liable on this letter, and Dr. Lutzer signed the same letter that the chairman of the elder board did. Now, that doesn't even make common sense. You don't even have to be legally trained to say, look, if you and I both signed the same letter, how can one not be guilty and the other guilty? Because there is nothing in this record anywhere that Lutzer knew there was a knowingly false statement, and that's what is so critical. Wouldn't that be for the plaintiff to raise that the jury was wrong for not finding liability on the other defendants? It simply supports the fact. And he chose not to do it? The plaintiff, I was surprised that the plaintiff didn't. And the plaintiff normally would have raised something like that, but it is an indication that the jury, looking at that letter, said the church is not liable, the chairman of the elder board is not liable. So what distinguishes from Dr. Lutzer? If we could figure out what makes juries tick. If you could, you could make a lot of money with that. But the important thing is this. The publication of the decision, which was not before you, which we've now raised, you've got at least ten jurisdictions out there that said publication of a protected process is also within the ecclesiastical abstention doctrine. You didn't have it before you because it wasn't raised. So therefore, this time around, you've now got it. And you're not bound by the law of the case because that issue is not even here. Now, no one court opinion supports the position they have taken, other than your remand opinion, which did not address the ecclesiastical abstention applying to publication. And remember back to the publication of your own opinions, which are protected by absolute privilege. And more do they, in fact, they don't even address in their brief the affirmative constitutional defenses on opinion and ecclesiastical opinion, which we both protect. What's the difference between ecclesiastical opinion and ecclesiastical fact? They're both religiously determined. Pardon? They're both religiously determined. Well, I would accept the argument as to who is or who is not a deity is an ecclesiastical opinion and or fact. But I don't know that I necessarily accept the argument that finding the plaintiff is an alcoholic or a philanderer is an ecclesiastical fact. I would agree that that can be both an ecclesiastical opinion and fact. And let me explain to you how that can be different. Scripture says if a man looks at a woman and lusts after her, he's committed adultery with her. If a person confesses that, hey, I have, as Jimmy Carter did, I have looked lustfully at other women, that's a violation of a religious opinion for which he as a deacon could have been removed. Now, from a secular point of view, simply looking and lusting after another woman is not adultery. And no law requires that, nor is that rape or anything else like that. So you could have an opinion that ecclesiastically is, yes, a violation, but secondly is not. So ecclesiastical facts and ecclesiastical opinions are ecclesiastically and religiously determined, and they are not always the same as what would be secular. Mr. Sharp, we said in the first disposition, we determined that we do not need to inquire into or interpret religious matters to decide whether the May 9, 2000 letter was a tortious invasion of privacy. We are not required to look at religious doctrine or biblical underpinning of the Moody Church's right to revoke the ordination to determine whether defendants' conduct invaded plaintiff's privacy by publishing false information. How can you say we haven't discussed the issue of publication? You did discuss the issue of publication, but what you raised earlier was what was the extent of the ecclesiastical abstention doctrine, and earlier you wrote that it was confined to the process. In fact, the language is this. The parties focus on the process of making the decision. That showed it was only raised and only decided on the process, like the making of an opinion process. The publication, because it was not raised, you had no chance to even look for the authorities. Which had you had that before you and you looked for the authorities on the publication part of it, you would not have written what you did, but it wasn't raised for you. That's where the problem came about. You weren't given ecclesiastical abstention applying both to the making and the publication. Because I promise you, had you all had the opportunity to look at the publication part, you would never have written that, because all the authorities out there, which the amici cite and bring retailer against them. But as you noted, I did write that. I know. That's why I said that. Was I palpably erroneous in writing that? Yes, ma'am, because it was not raised to you that the ecclesiastical abstention doctrine was applying to the publication part. It was only given to you by both parties that it only applied to the decision making. So what you ventured into that is clearly contrary to everything that's out there was because you weren't given that it applied to the publication. Then if you had put into your computer, publication, ecclesiastical abstention doctrine, man, those cases would have popped up and you would have never written it. Are you saying that the church has a right to publish their decisions publicly or only within the church proper? In other words, one's privileged, one is not. The courts hold that you have the right to publish an ecclesiastical opinion to those with whom they have a right or an interest in it. The court opinions are absolutely clear on that. Now, when it comes to publication of anything to the public, religious or otherwise, you then fall into the speech clause and its interpretation under Gertz. Therefore, you use the measuring stick of Gertz when it goes to the public at large. Well, am I to understand that it's your position that nothing the church ever says relative to ordinations is actionable? Correct. If it's published appropriately, and I'm talking about going to the individual who's getting it, that's the Opal case. You don't have anything in the reported opinions, and the anarchy had been great to give you a ton of them, where you have the publication to the public at large that so-and-so lost their credentials because they held up the Chicago bank. You don't have that. Well, unless the parties that came before you would make the complaint, aren't members of the church, why wouldn't that be deemed to be a publication outside the church? Well, first of all, as to members, that would be a different situation, because when a member leaves a church, they don't take their membership with them. They leave it behind. But when a minister leaves with an ordination, it goes with the minister. In fact, the vast majority of religious bodies who ordain ministers… You didn't answer my question. Oh, I'm sorry. Excuse me. Would you repeat the question, please? I believe the three individuals that came to Moody Church and raised the issues were not members of Moody Church. Correct. And therefore, was this a publication outside the church because the letters were sent to someone or several someones who were not members of the church? Yes, this was published to people who were not members of the church. Okay. So if it was published to members other than church members, was this a public publication? And if it was a public publication, was it in some way privileged? I can accept your argument that what goes on in Las Vegas churches stays in Las Vegas churches. But I'm having a problem here when you say that the church has the right to publish things that relates to its doctrine, its structure, its ordinations to third parties who are not members of the church. That seems to me to be outside the privilege. Now, privilege, by any definition, is going to individuals who have an interest in or a right to know. And if those three former leaders of his church who are aware of the… Then why do they have a right to know if they are not members of your church? It has to do with the ordination, not the membership. And ordination is like the… But you keep coming back to it. It's the ordination, not the reasons for it. The ordination… I have a reason to revoke it. I'm sorry. They saw conduct that they felt was contrary to somebody holding a Moody church ordination, and they felt Moody needed to know about it. And so that gave them an interest, and it certainly was of interest to Moody because any pastor or any minister ordained by Moody who engages in conduct later, regardless of where they are, that reflects badly back on the church, they have the right to go and get that ordination. And how did you know that he engaged in that conduct? Because the people from… Somebody told you, right? It came from credible people. How do you know they were credible? Where in the record does it establish that the three people who came to you were credible? You made no investigation. You didn't even verify their identities. The record shows… Based on the record. No, the record shows these three people were formally in leadership of his church. That goes to credibility. Because you know in general that if you're going to be an elder in a church, you have to meet certain scriptural requirements. Moody is aware of that. So this is coming from people that have credibility in the religious community. They absolutely have. That's in the record. They have credibility in the religious community. So therefore, whatever they said to you was inherently true? There's no false statement in the record. If that was so, why even give the plaintiff an opportunity to respond? We know because of the stature of the person making the statement that the statement must be true. Do you see the inconsistency there? Either they're so credible that their statement is true that it didn't make any sense to invite the plaintiff, or you really didn't know if the statements were true or not, and you didn't investigate and went on to publish them. Judge, you're going to the process that they went through, and you have no jurisdiction over that process. Yes, it's part of it. Whatever process you use behind closed doors is your business. But once you go beyond saying your ordination is revoked, the reasons we're doing it, arguably, if they're false, you run the risk of making false statements. The reasons in whatever you do, whoever you decide to ordain or revoke the ordination or anything in between, whatever other sanctions might be appropriate, once you say it to beyond members of your church, the reasons why you're doing that, inherently making those statements true, you run the risk of disliability. All the courts that have addressed that have said no. It's outside the subject matter jurisdiction, and there are 10 cases cited to you that say just to the contrary of what you just said. So what I'm saying is you're trying to evaluate the publication as to whether or not it's actionable or not, even though the publication has been held by all other courts to be outside their subject matter jurisdiction. And by the way, remember, there was no false statement in this. There was no knowingly false statement at the time of publication. What did you just say about being outside their subject matter jurisdiction? That's what the court opinions say. For example, you have the Higgins v. Marr case where there was a publication of a priest and his credentials being revoked. The court found he was defamed and his privacy was invaded because the publication contained knowingly false statements that also caused him intentional infliction of emotional distress. And the California court said that publication is outside our jurisdiction and dismissed it. It affirmed a dismissal at the trial court. And under the facts of the case, who did they publish it to? It was published to those involved with the church or who were affected by the priest's ministry. Were they members of the church? No, they were members of many churches. Many churches were involved in that. Those were all the churches that that priest had been at or pastor at? I'm sorry? In Higgins, the people that were informed were not those members of parishes where that priest had been assigned? No, they went to the whole diocese, which uncovered a lot more places that he had not been. Okay. They went way beyond that. And, by the way, if you also look, there are other cases that don't involve, like the Catholic church, that involve independent churches, Southern Baptist churches, Assemblies of God, Church of God. Publications have gone like that, and the courts have held the publication, even if it's defamatory, is still false within the Ecclesiastical Extension Doctrine. And, by the way, that Washington case that cites Bruss has got some really good language that if you analyze it, it has to apply to this. Here again, in bottom line, no false statement. Jury found Peterson not guilty, the church not guilty, no annoyingly false statement. There was nothing that was published against him. I really believe that you can craft a very good opinion that will follow the principles of Bruss and clearly explain that when you remanded the opinion you only had before you the Ecclesiastical Extension Doctrine as to the making of it. We now have before us the Ecclesiastical Extension Doctrine as to publication, which we didn't have the first time. And, based on that, we have no subject matter jurisdiction. That way you deal with what you had to deal with properly. Thank you very much. Thank you. We'll take the case under advisement. There will be a short recess.